## 8716. DRAPER v. GEORGIA, FLORIDA AND ALABAMA RAILWAY COMPANY.

1. The court did not err in overruling the demurrers.
(a) An interstate carrier must make and publish a rate open to all, in order to exact a higher rate for a special service; but "it can not be assumed, merely because the contrary has not been established by proof, that an interstate railway carrier is conducting its affairs in violation of law." The contract on its face was valid, and nothing appears therein from which it may be inferred that this and similar contracts for a special service therein agreed upon were not provided for by tariffs regularly made and published in conformity with law according the same privileges and rights to all other shippers similarly situated.
(b) The allegations in the petition are not subject to the ground of the demurrer insisting that the facts pleaded therein show a rescission of the delivery made under the contract between the parties.
(c) The statement in the brief of counsel for the plaintiff in error that "we insist on all of the grounds of the general demurrer" does not amount to an argument (see Pelham Phosphate Co. v. Daniels, ante, 547 (94 S. E. 846), and numerous cases there cited) ; and other grounds of the demurrer not referred to above will not be passed upon.
2. The refusal of the court to award a nonsuit will not be considered when there is also an assignment of error upon the overruling of a motion for a new trial in which a verdict for the plaintiff is complained of as not supported by the evidence. See Collins v. Strickland, ante, 542 (94 S. E. 1035), and numerous cases there cited.
3. The various special grounds of the motion for a new trial in support of which argument is presented are without such substantial merit as to require a reversal.
4. There was no evidence which tended to show that an unlawful preference was extended to the defendants under the contract sued upon, and the court did not err in directing a verdict for the plaintiff.

DECIDED JANUARY 30,—REHEARING DENIED FEBRUARY 14, 1918.

Action on bond; from city court of Bainbridge—Judge Spooner. February 26, 1917.

The Georgia, Florida and Alabama Railway Company brought suit against H. C. Draper upon a bond. The petition alleged that so much of the bond was breached as is contained in the following excerpt therefrom: "As to all 'order notify' shipments it is further understood and agreed that the Georgia, Florida & Alabama Railway Company will properly place after arrival at Bainbridge on consignee's track near its warehouse all shipments consigned to 'order notify' Draper-Garrett Grocery Company. And the said Draper-Garrett Grocery Company on its part agrees to deliver to the local station agent of said Georgia, Florida & Ala-

bama Railway Company the original bills of lading covering such 'order notify' shipments within six hours after the opening of the bank holding such bills of lading and following the delivery of such shipments by the said railway company. In case of failure on the part of said Draper-Garrett Grocery Company to deliver to said agent of the railway company the original bills of lading covering such 'order notify' shipments, then the said surety H. C. Draper hereby agrees to protect the said railway company against any loss for the value of such shipments so delivered, and hereby binds himself, his heirs, executors, and administrators firmly by these presents for whatever amount it may be necessary for said railway company to pay to the consignors of such 'order notify' shipments, either direct or through connecting lines of the said railway company, and caused by the failure of the said Draper-Garrett Grocery Company to deliver such original bills of lading as herein agreed by it." It was alleged that the breach of this bond occurred as follows: that on or about May 13, 1910, the Blish Milling Company, of Seymour, Indiana, shipped from that place to Bainbridge, Georgia, a carload of flour, consigned to itself, with order to notify Draper-Garrett Grocery Company, specifying a routing over plaintiff's lines; that the carload of flour arrived at Bainbridge June 2, 1910, and was delivered to the Draper-Garrett Grocery Company on its private side-track, as provided by the said contract, without demanding the surrender of the bill of lading; that the grocery company thereupon opened the car and unloaded a part of its contents, but, discovering that some of the flour was wet, reloaded all that had been removed from said car, and turned the car back to the plaintiff railway company, stating that the flour was damaged and that the grocery company would not accept it; that, being unable to induce either the consignor or the Draper-Garrett Grocery Company to accept it, the carrier thereupon proceeded to dispose of the flour under the law of Georgia relative to unclaimed perishable freight. Thereafter the Blish Milling Company brought suit in trover against the railway company (the plaintiff in the present case) alleging a conversion of the shipment by the carrier, because it had delivered the flour to the grocery company without surrender of the bill of lading; and, the plaintiff having elected to take a money verdict for the value of the property, the jury returned a verdict in its

favor for $1,084.50, with interest from June 2, 1910, at seven per cent.; that this verdict was affirmed by the Court of Appeals of Georgia (see *G., F. & A. Ry. Co.* v. *Blish Milling Co.,* 15 *Ga. App.* 142, 82 S. E. 784), and the case was then carried to the Supreme Court of the United States, where the judgment of the Court of Appeals was affirmed, and the railway company required to pay to the Blish Milling Company the amount of the judgment recovered by that company (241 U. S. 190, 36 Sup. Ct. 541, 60 L. ed. 948); and that the present suit was then filed by the Georgia, Florida & Alabama Railway Company against H. C. Draper, as surety on the bond which is above referred to and a copy of which was attached to the petition. The petition further alleged: that Draper had full knowledge of the previous suit and testified as a witness at the trial; that the cause of action of the Blish Milling Company against the present plaintiff was predicated upon the contention that the delivery by plaintiff to the Draper-Garrett Grocery Company of the car of flour, without first demanding and obtaining the bill of lading, amounted to a conversion; which contention was *in effect* sustained by the Court of Appeals of Georgia and by the Supreme Court of the United States in affirming the judgment against the plaintiff; that the said Draper contracted and agreed, as surety on the said bond, "to protect the said railway company against *any loss*" (italics ours) for the value of "order notify" shipments delivered to the Draper-Garrett Grocery Company before surrendering to the carrier the bills of lading therefor, or, as stated in the petition, "to hold plaintiff harmless and to make good to plaintiff whatever amount [it] was required to expend;" that the Draper-Garrett Grocery Company was a corporation which had been dissolved and was legally dead when the suit under consideration was instituted; and that the plaintiff incurred various items of expense in addition to the amount of the judgment recovered against it in defending the suit, all of which are specifically set forth. The defendant interposed certain demurrers, both general and special, which were overruled. The court, on the trial of the case, directed a verdict for the plaintiff. The bill of exceptions complains of the overruling of the demurrers and of the refusal to grant the defendant's motion for a new trial.

*W. V. Custer,* for plaintiff in error.    *T. S. Hawes,* contra.

WADE, C. J. (After stating the foregoing facts.) Only two grounds of the demurrer are insisted upon in the briefs of counsel for the plaintiff in error, to wit: that the instrument sued on is void and unenforceable, because it created a preference in favor of Draper-Garrett Grocery Company, in violation of the act of Congress commonly known as the "Elkins act;" and also because "said declaration showed upon its face that if there was a delivery of the property, of which suit is brought, to Draper-Garrett Grocery Company, under said obligation sued upon, that there was an absolute rescission of said delivery and an acceptance of the property by the Georgia, Florida & Alabama Railway Company in lieu of the bill of lading." That portion of the Federal act which counsel for plaintiff in error contends renders the instrument sued upon void is as follows: "It shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced." Act of February 19, 1903, c. 708, 32 Stat. 847 (10 Fed. Stat. Ann. 171, U. S. Comp. St. 1916, §§ 8597-8599). Applying this portion of the act to the petition in the case under review we can not say, as a matter of law, that the pleadings show on their face that the instrument sued on constituted a "preference" or "discrimination" in favor of the defendant, since there are no allegations in the petition (nor was there even proof adduced at the trial) to the effect that similar contracts were not made with other shippers, or that the published tariffs filed with the commission contained no provision authorizing such a contract as forms the basis of this suit. There being no such allegations or proof, it must therefore be presumed that the railway company, in executing the contract sued on, acted in accordance with the law, until the contrary is shown. In the case of Cincinnati &c. R. Co. *v.* Rankin, 241 U. S. 319 (36 Sup. Ct. 555, 60 L. ed. 1022, 1026), it is said that "it can not be assumed,

merely because the contrary has not been established by proof, that an interstate railway carrier is conducting its affairs in violation of law. Such a carrier must comply with strict requirements of the Federal statutes or become subject to heavy penalties, and, in respect of transactions in the ordinary course of business, it is entitled to the presumption of right conduct. The law 'presumes that every man, in his private and official character, does his duty, [and] until the contrary is proved it will presume that all things are rightly done, unless the circumstances of the case overturn this presumption, according to the maxim, omnia presumuntur rite et solemnitur esse acta, donec probetur in contrarium.' " The view here expressed is not in conflict with the ruling in C. & A. R. v. Kirby, 225 U. S. 155 (32 Sup. Ct. 648, 56 L. ed. 1035, 1037, Ann. Cas. 1914A, 501), cited and strongly relied upon by the plaintiff in error, since that case was clearly dealing with facts in evidence which showed that "the railroad company had established and published through joint rates and charges upon carload shipments. . . The rates furnished the defendant in error [the shipper] were the regularly published rates. Those rates and schedules did not provide for an expedited service, nor for transportation by any particular train. Neither was Kirby [the shipper] required to pay any other or higher rate for the promised special service, by which his car was to be carried so as to be attached to the fast stock special and carried by it to New York." The contract sued on in the case under consideration may have provided for a special service, and if so, as was said by Mr. Justice Lurton in the Kirby case, supra, "for such a special service and higher responsibility it might clearly exact a higher rate, but to do so it must make and publish a rate open to all." The facts in the Kirby case showed, however, that no such steps had been taken, and the railroad based its defense on this ground; whereas in the instant case neither the pleadings nor the evidence adduced even intimated that the published tariffs did not provide for the precise kind of contract sued upon, or that similar contracts were not made with others. It is suggested by counsel for the plaintiff in error that a mere reading of the contract will convince the court that it was the intention of the railway company to extend to the Draper-Garrett Grocery Company a preferential privilege. We can not assent to this contention, since it does not thus appear

as stated above, that similar contracts were not made with other shippers, or that tariffs were not filed covering this, and other like contracts.

It is well settled that "a railroad company which is an interstate common carrier can not enter into a contract with a shipper which constitutes an unlawful or undue preference under the interstate commerce act." *Florida R. Co.* v. *Cherokee Sawmill Co.,* 137 *Ga.* 815, 821 (74 S. E. 523). See also Southern Pacific Terminal Co. *v.* Interstate Commerce Commission, 219 U. S. 498 (31 Sup. Ct. 279, 55 L. ed. 310). "General statements that there must be no difference in charges not based on difference in service, that rates must be equal to all under like conditions, and that unjust and unreasonable discrimination is forbidden, may be found in the opinions of the courts and of the Interstate Commerce Commission in cases in which they were discussing radical differences in the direct charges for transportation under like conditions (see Western Union Tel. Co. *v.* Call Publishing Co., 181 U. S. 92, 100, 21 Sup. Ct. 561, 45 L. ed. 765; Cincinnati, New Orleans & Texas Pacific Ry. Co. *v.* Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. ed. 935; United States *v.* Vacuum Oil Co. [D. C.] 153 Fed. 598, 606, 607 [and other cases cited]; and in cases in which the carriers absolutely refused to carry the property tendered on any terms, as in Crescent Liquor Co. *v.* Platt (C. C.), 148 Fed. 894, 903, or to furnish cars at proper times and places where the rates were the same, as in Castle *v.* Baltimore & Ohio R. R. Co., 8 Interst. Com. R. 333, 344. Opinions of State courts may also be cited under statutes which depart from the language and the true interpretation of the interstate commerce act, and require certain carriers to grant 'equal terms, facilities, accommodations and usages,' and forbid them from 'granting any terms, credit, privileges, advantages, usages or facilities' to one that are not granted to all (Burns' Ann. St. Indiana, 1901, § 3312b), which hold that every person or corporation is lawfully entitled to every privilege and courtesy extended to any other similarly situated, so that under these statutes and decisions no carrier may waive any right or extend any courtesy to any person or corporation without becoming legally bound to do likewise to every other person or corporation under similar conditions." Gamble-Robinson Com. Co. *v.* Chicago and N. W. Ry. Co., 168

Fed. 161, 166, 167 (94 C. C. A. 217, 21 L. R. A. (N. S.) 982, 16 Ann. Cas. 613). From a careful study of the briefs of the plaintiff in error we infer that it is in the light of these statutes and opinions that the contract under consideration is complained of. The interstate-commerce act has been differently construed, however. The correct interpretation of this act was clearly given by Judge Jackson (afterwards Mr. Justice Jackson of the United States Supreme Court), in the case of Interstate Commerce Commission v. Baltimore & Ohio R. Co. (C. C.), 43 Fed. 37, in the following language, which was subsequently several times approved and adopted by the United States Supreme Court: "Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue preference or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits." In view of this clear statement of the law, we can not hold that the railway company discriminated against any competitor of the defendant, located at Bainbridge, merely by contracting with the Draper-Garrett Grocery Company to deliver all "order notify" shipments upon its private side-track before receiving from it the bills of lading for the same; nor can we say that this contract constituted what is commonly known as a "preference" in favor of the grocery company and against others similarly situated. The railway, in delivering "order notify" shipments to the grocery company before obtaining from it bills of lading therefor, was in effect merely extending credit, and surely the equality of treatment and denial of preferences contemplated by the statute would not compel the carrier to extend the same credit to all others, some of whom might be less responsible commercially, and therefore not entitled to such indulgence, for sound business or financial reasons; and, as already suggested, it does not appear that other solvent and responsible parties were denied the

same privilege.    See further, in this connection, Gamble-Robinson Com'n Co. *v.* Chicago & N. W. Ry. Co., supra.

In the next ground of the demurrer insisted upon by plaintiff in error it is contended that the petition shows on its face that there was an absolute rescission of the delivery of the shipment to the Draper-Garrett Grocery Company, and an acceptance by the railway company of the property when refused and returned to it, in lieu of the bill of lading.    This contention is likewise without merit.    The petition did not show on its face that there had been a rescission of the delivery under the contract, since, before there could be such a rescission, there must have been a voluntary acceptance of the returned shipment by the railway company, and it nowhere appears that the carrier ever consented to the return of the shipment to it, but, to the contrary, the car was reloaded by the "order notify" consignee, and the petition distinctly alleges that thereafter the "plaintiff, having the flour on hand and *being unable to get it accepted by the Draper-Garrett Grocery Company,* proceeded to dispose of the same under the law of Georgia relative to unclaimed freight."    In order that the ruling on this point may be understood more clearly, it will be well to recall, in this connection, that the contract sued on provided that the railway company should deliver to the grocery company all "order notify" shipments without demanding the surrender of the bills of lading; and, by way of self-protection for this special privilege extended to the grocery company, the railway company had the grocery company execute the bond containing the provision that the surety (H. C. Draper, the defendant) would protect the railway company against any loss for the value of such shipment so delivered, and the surety bound himself "for whatever amount it may be necessary for said railway company to pay to the consignors of such order notify shipments, either direct or through connecting lines of the railway company, and caused by the failure of the said Draper-Garrett Grocery Company to deliver said original bills of lading as herein agreed by it."    By a reference to the decision of the United States Supreme Court in the case of G. F. & A. Ry. Co. *v.* Blish Milling Co., supra, it will be seen that by complying with the exact terms of its contract with the grocery company, the railway company was held responsible in damages to the consignor, the Blish Milling Company; and, unless there

was a complete rescission of the contract, we see no reason why Draper, as surety on the bond executed by the grocery company, should not be held liable under his agreement, which in effect declared that he would be responsible to the railway company for whatever loss resulted because of its compliance with the terms thereof. In the absence of a voluntary acceptance of the carload of flour by the railway company, nothing appears which could amount to a legal and binding rescission of the contract on the part of the railway company; for the refusal of the shipment by the Draper-Garrett Grocery Company, whereby the railway was forced to retake control of the flour reloaded in the car by the grocery company, and its subsequent sale to reduce the loss as much as possible, did not constitute such a rescission. The railway company, in the premises, was powerless to do anything else after the refusal by the grocery company, as well as by the Blish Milling Company, to receive the flour, than to assume possession again and dispose of it in accordance with the statute law of our State relative to unclaimed perishable freight. Surely the mere fact that the railway company took possession of the flour under these circumstances could not release Draper from a liability which became fixed when the car was delivered without the surrender of the bill of lading. There are numerous decisions by the Supreme Court and this court holding that a contract can not be abrogated by one of the parties only. "A written contract can not be abrogated by one of the parties without the assent of the other." *Starling* v. *State*, 5 *Ga. App.* 171 (62 S. E. 993); *Oklahoma Vinegar Co.* v. *Carter*, 116 *Ga.* 140 (42 S. E. 378, 59 L. R. A. 122, 94 Am. St. R. 112); *Central of Georgia Ry. Co.* v. *Gortatowsky*, 123 *Ga.* 366 (5), 375 (57 S. E. 469); *Phosphate Mining Co.* v. *Atlanta Oil &c. Co.*, 20 *Ga. App.* 660 (6), 662 (93 S. E. 532).

As suggested above, no intention on the part of the railway company to rescind the delivery under the contract can properly be inferred from the simple fact that it retook possession of the shipment refused by the consignee and the consignor, and therefore this ground of the demurrer is without merit.

The numerous special grounds of the motion for a new trial which are argued in the briefs of counsel for the plaintiff in error are without substantial merit.

The pleadings and the evidence demanding a verdict in favor of the plaintiff, the court did not err in so directing.

*Judgment affirmed.* *Jenkins and Luke, JJ., concur.*